Sandoval v. City of Pflugerville Mr. Walsh Whenever you're ready, Mr. Walsh. Thank you, Your Honor. May it please the Court. My name is Colin Walsh, and I represent Ms. Sandoval in this appeal. Summary judgment should be reversed for two reasons. First, the trial court failed to make reasonable inferences in favor of Ms. Sandoval. And second, the trial court applied the wrong standard to her First Amendment claim. In this case, Ms. Sandoval complained of sexual harassment. The city then defined those complaints of sexual harassment as insubordinate and disruptive. The city then fired Ms. Sandoval for being insubordinate and disruptive. Also, at Ms. Sandoval's unemployment hearing, Chief Charles Hooker, the decision maker in this case, testified that the insubordination Ms. Sandoval was fired for included those complaints of sexual harassment. During discovery for this case, defendants or appellees in this appeal admitted that the insubordination Ms. Sandoval was fired for included allegations of sexual harassment. Therefore, a jury could infer that the true reason for Ms. Sandoval's termination was retaliation for making complaints of sexual harassment. At the summary judgment stage, all reasonable inferences must be made in favor of the non-moving party. What is the protected activity? Was it her going to her supervisor or her talking to her colleagues in the dispatch area? Maybe it's all of it, but pinpoint for me the protected activity that you're saying she was retaliated for engaging in. Yes, Your Honor, the protected activity would actually be all of it. It would be when she went to her supervisors and complained of sexual harassment and they did not provide an adequate response. It would be when she had these conversations because nothing was— Well, let's stop with the first one. What did she say about sexual harassment to her supervisor? I take it you're talking about the episode before, when she went to her supervisor before she took leave for a period? Yes, Your Honor. She actually went to her supervisor a couple of different times during this case. The first time was in 2010, and the only advice she was given was to simply defriend Sergeant Vronka. Nothing else was done at that time. Are you alleging the 2010 incident was a protected activity that she was retaliated for more than three years later? I think her complaints of sexual harassment played into it, but the specific ones at issue in this case are the ones that happened much later, when it comes up again in 2013. I'm looking at the August 13th. Her supervisor says, the plaintiff came to me advising she was having issues with Sergeant Vronka, constantly bothering her with text messages, but she stated his remarks were not of a sexual nature, but enough to where she did not want his text any longer. So you characterize that? Is there anything else in the record that would show me that she said she was being sexually harassed at that time? Because what I just read indicates she said it wasn't a sexual-based problem. Yes, Your Honor. I can't tell you whether she used the word sexual harassment when she went to her supervisor, but she did believe that she was being sexually harassed, and the evidence of that is the reports from— Even though she says it was not sexual in nature. Well, if you look at what the complaint that led to Ms. Sandoval's termination, the complaint by Sarah Cawthorn. In that complaint, Ms. Cawthorn states that Ms. Sandoval was complaining that she had been sexually harassed by a co-worker and that nothing had been done. And she constantly disregarded the employer's instructions to stop talking about things that weren't happening in the office and at home and off campus, and that she disregarded those instructions and continued repeatedly to talk about the other officer of name I don't have and things like that. I mean, the record before us reads like a multiple of no good deed goes unpunished. They tried, they moved people, they gave instructions, and she disregarded them. Your Honor, my response to that would be they didn't do anything. In fact, when she complained the first time, all they did was say defender. When she went and— No, it gets—from the first time on, it gets greater and greater and greater. The first time was minimal and the response was reasonable, and it keeps escalating by her. Well, Your Honor, when she went to that—when she went to her supervisor in August of 2013, she stated that she did not want to be on the same shift as Sergeant Brunk. She asked if he could not be placed because at that time they were placing police officers on the shifts. She said she was uncomfortable with him. She did not like the text, the frequency, the content, and the times they were sent to her, and she asked if she could be—if they could not place him on her shift. They ignored her, and they did. And then these issues continued, and we have text messages in the record showing that these things continued after she went to her supervisor. If you look at record page 464 to 465, these are issues happening in September where Ms. Sandoval is discussing the fact that she went to Stacy Velasquez, her supervisor, about the Sergeant Brunk issues, saying that she doesn't trust them, that they haven't been resolved. If you then go to record page 465, you see that she is even asked— And so a jury could infer from that that she had no other option, really. She was kind of cornered because she had gone to her supervisor a couple different times. They had not made an adequate response. Instead, they put it on her. They said, you defriend him. You stop talking about it. And then they wrote her up. In fact, they even put him on the same shift as her. And so a jury could infer then that she had acted reasonably when she did go to the only other people she could go to, her dispatchers, because as Ms. Cawthorn said, nothing was happening. The actual wording on record page 589 is that a police officer had, quote, sexually harassed and made advances towards her, and nothing had been done about it. In the Belinda Polasek affidavit at record page 510, Ms. Polasek also acknowledges that Ms. Sandoval felt she had no other options. Quote, she did not believe anyone was listening to her about these allegations. So here she's gone to her supervisor, and they told her, you know, they didn't do anything. They told her, it's your fault. Stop talking about it. So she goes to these dispatchers who do ask her what's going on. And, in fact, the significant thing about this is that after she was given this order, not to discuss personal issues, after she was written up in October, she goes to these dispatchers and asks them, and this is on record page 465, and I do apologize in the reply brief we misstate the page number of this following quote, do you want me on this shift or not? And the response is a yes. And that's on record page 465. She also talked to her dispatcher, to the other dispatchers. They said they didn't have any problems with anything that Ms. Sandoval discussed with them. That's on record page 432. They told her, we didn't complain about you. Again, that's on record page 432 at page 114. In fact, they would ask what's going on. Again, record page 432 at page 116. And so what a jury could infer from that is that the true reason for her termination was retaliation. And there was one critical piece of evidence. There's actually a couple critical pieces of evidence that the trial court ignored or rejected. And perhaps our best evidence here is the testimony that Chief Hooker gave during Ms. Sandoval's unemployment hearing, where he testified that the reason she was being fired was because of her complaints of sexual harassment. At the unemployment hearing, he engaged in the following testimony. Question. Would you agree that Ms. Sandoval complained of sexual harassment to Ms. Bennett on February 17, 2014? Chief Hooker responded, that is what Ms. Bennett states. You have no reason to doubt that, correct? I have no doubt from Ms. Bennett that Ms. Sandoval said that to her. Would you agree that Ms. Sandoval was written up because of this complaint? Of course. There was an allegation. Okay. Would you agree that you terminated Ms. Sandoval because of this complaint? Chief Hooker then responded, it did. It was sustained as insubordinate, yes. This is on record, page 13, paragraph 51. It's also located in our brief at page 13. In a retaliation claim, the conduct the plaintiff's complaining about doesn't actually have to be a Title VII violation, but the plaintiff does have to have a reasonable belief that it was a Title VII violation. So tell me what supports your client believing that she had been subject to unlawful harassment? Well, I would say that what supports that is that Ms. Sandoval received a large volume of texts from Sergeant Vranca. These were personal in nature, and they included texts about her smile, her beautiful smile, how Sergeant Vranca enjoyed looking at her smile, and even one that occurred at 4 a.m. saying that he was up thinking about her. That was back in 2010, right? Yes, those texts were in 2010. And then when she refriended her, the same type of Facebook messages started coming up again. These were personal messages sent at all times of the day, and they included at least one photograph of Sergeant Vranca on a bike that was sent to my client. She felt this was unwelcome to her. She felt that this made her uncomfortable. So you know that under our case law, just communications from one employee to another, even if excessive, even if it makes someone uncomfortable, doesn't get close to the severe or pervasive requirement we have for harassment claims? Well, Your Honor, what I would say is that the sexual harassment, as Your Honor brought up, does not— Yes, Your Honor. So there's two cases that I would cite for that proposition. There's EEOC v. Rightway. And in that case— That's why I'm asking you. I'm sorry, Your Honor. Respond, but tell me how you would say that's similar to the facts there. Well, in that case, what this Court found was that there was an actual retaliation claim, despite the fact that the sexual harassment was not potentially actionable. It was based on a single joke, and the question was whether or not she believed that it was sexual harassment. What this Court did, what Your Honor did in that case, was go through all of the cases where the Fifth Circuit had found that there was not actual sexual harassment, but that the person's honest belief that they had been sexually harassed gave rise to a valid retaliation claim. And one of the cases cited in there is Glorioso v. Mississippi Department of Corrections, in which this Court found that the plaintiff could have a reasonable belief that being called a bitch was sexual harassment. And what this Court said was that they looked at the evidence, and that plaintiff in that case had testified that she believed, as soon as she was called bitch, that she had been sexually harassed. And what the Court noted, and what is similar in this case, is that the objective reasonableness has not been challenged and was not before this Court. So, appellees have not said that it was unreasonable for her to think that Sergeant Veronica's actions were sexually harassed. They've only challenged whether or not it was actionable, and then whether or not the way that she complained about it provided a legitimate reason for her termination. Doesn't all of that have to be viewed within the four corners of her activities too, her continued talking about sexual things to her coworkers and everything that she was doing, despite having been told numerous times not to do that? Yes, Your Honor, but reasonable inferences must be made in Ms. Sandoval's favor, and all facts must be viewed in light most favorable to Ms. Sandoval. And viewing these facts most favorably to Ms. Sandoval shows that a jury could find, as the District Court found, that she was fired in part due to conversations that included allegations of sexual harassment. In fact, the trial court found that that was consistent with their stated reason for Ms. Sandoval's termination. And under this Court's holding in Ion v. Chevron, what this Court found was that when an employer links protected activity to an adverse action, it allows a jury to make a reasonable inference that retaliation is the true motive. In Ion v. Chevron, this was an FMLA retaliation case, and the employee had been fired for poor performance, absences, and tardies. And in the termination letter listing the numerous reasons for this employee's termination, they also made a reference to a period of time that was covered by FMLA leave. And what this Court held was, quote, the inclusion of this statement in the same paragraph listing reasons for Ion's termination could indicate that his absence was also a reason for termination. It's also important to note that the order Ms. Sandoval was given was not to discuss personal issues. And if you look at record page 495, the affidavit from Lori Bauman states that others engaged in personal conversations. Some level of discussion, and I'm quoting, about personal life will occur during a nightly shift. If you look at interrogatory 13 at record page 155, no one else was written up, investigated, reprimanded, terminated, or disciplined. Is there any evidence anyone else was engaging in the conduct she was engaging in? I mean, to say no one else was written up, you have to identify someone who did something similar but wasn't disciplined. Well, we have Lori Bauman's affidavit saying that people did discuss personal issues, saying some level of discussion about personal life will occur during a nightly 12-hour shift. And so what is the difference then between Ms. Sandoval's discussion and Lori Bauman's discussion? Well, she complained of sexual harassment and civil rights violations. That is an inference the jury could make, and that is an inference that the Court erred in failing to make in favor of Ms. Sandoval. I see that I am out of time, and so I'll simply ask this Court to reverse summary judgment in favor of the city because there is a fact issue as to whether the true reason for Ms. Sandoval's termination was retaliation for making sexual harassment complaints. Thank you. This case involves a supervisor who is terminated after repetitive, progressive discipline, both informal and formal, about her communications with her subordinates. That is what this case is about. There is no evidence that anything that was done by the city of Pflugerville was because of the specific complaints that were made. It's because of a supervisor who continued to subject her subordinates to what was essentially an untenable situation. This case involves a supervisor who puts her subordinates in a place where they can't respond. A subordinate is not in a position to tell someone, I don't want to hear that anymore. I disagree with you. I don't want to be in this room anymore, and I'm going to walk out. That is what the problem was with Ms. Sandoval's conduct. This is not a case where she made a single complaint and the city said, you're talking about something that we think is protected or you shouldn't be, we're letting you go. Was I on a single complaint case? I was different because I guess the only issue was the reference to FMLA in the report about termination. And the difference in that case that's fundamental is in that case the employer was saying, look, his FMLA leave had nothing to do with it. Not retaliation versus non-retaliation for leave, but being off of work had nothing to do with it. The city has never tried to dance around the reality that does make this a more delicate situation for us, which is the communication she engaged in involved all types of things, but they most definitely included items that are protected by the statutes. We have never tried to dance around that. The city has never said that wasn't part of her communications. When the complaints came in, they were what they were. We couldn't change them if we wanted. What her employees were complaining about. You heard some of our questions. When you say items that were protected, what aspect was it that was protected? Where had she complained of sexual harassment? With respect to sexual harassment, the first time she used the word sexual harassment was when she talked to Coffin about something that had happened months previously and that had ended months previously. But we do not dispute that she used those words. Now, is that reasonable? We would say no, and frankly, in her testimony that's in the record and deposition, she admitted there was nothing this man had said to her in 2013 that was sexual in nature. Not one thing. She was concerned that his texts were increasing. But you can look at the record and look at what he sent her, and there is nothing about it. There's also her admission that she never told them she didn't want those communications. And, in fact, in September of 2013, she told him that, he apologized, and they stopped. There is no evidence in the record of anything involving this individual after that. So by the time she is talking to Ms. Coffin and she uses the word sexual harassment, we are well beyond those moments. But we do not dispute that she used those words at that time in conjunction with a number of other complaints. But the issue for the city was not what words she used. It's why are you still talking to your subordinates about any of these items, regardless of what they were, whether it was about harassment, whether it was about you didn't like the city, whether it was you thought that your bosses were unfair to you, all of those items. When he zeroes in on the chief's statements about firing her for, I guess, record page 13, what would your thoughts be on that? Ms. Coffin's complaint. She was terminated because Ms. Coffin complained about her supervisor subjecting her to this environment. Absolutely. That's what violated her previous order, do not talk to your subordinates about this. That was the last straw. There was a whole series of formal and informal, oral and written, escalating instructions for her to cease and desist. Absolutely, Your Honor. I don't know that I've ever had a case that has had this many steps to get determination. The first time it came up, we didn't even take her aside. The first thing they did is brought all the dispatch supervisors in and said, guys, don't be doing that to your subordinates. Don't be talking to them about your personal gripes and your personal issues. You put them in a bad spot. They also sent everyone, including her, to a supervisor class that talked about the same thing. If you're unhappy about something with your employer, talk to the guys on the same level as you. Go upstream. Don't go downstream. Those people can't do anything about it. They're not your friends. You need to be able to supervise them. And there is no dispute in this case that she was their supervisor. If you read a palance brief, you will not see the word supervisor. You will not see the word subordinate. But that was the relationship, and there is no dispute. She held her hand over their future. She did their write-ups. She approved time off. She recommended discipline. And so we started saying, look, all supervisors, you can't do that. Don't do that to your people. When it continued, we took her aside informally and said, you can't be doing that. It's not fair to your subordinates. When it continued, we wrote her up. When it appeared that she was really having some problems that we hadn't seen in the past. She was a long-term employee. We could have at that moment just said, you know what, that's enough. We told you not to be doing it. We've met with you three times. It's enough. But they didn't. They said, fine, let's give you some employee time. We're going to let you see if you can get better. When you come back, they sat down with her again and said, don't do that to your subordinates. We didn't tell her, don't talk about if you've been harassed or you think you've been mistreated. We didn't say that you couldn't make compliance. This woman could have gone upstream. She could have gone to any of her coworkers. We said, don't do that to your subordinates. And then she kept doing it. It's just she did it again. And so it's that issue. Not only when she came back, we gave her a new shift. We said, these dispatchers have already complained about you. Maybe that's not fair to put her back in that place. We gave her a new shift of subordinates. We gave her a new shift of patrol officers. So it was a fresh start for her. And within three weeks, we got two complaints from subordinates. The only reason the city knew this was happening, they weren't investigating this. They weren't conducting surveillance in the dispatch room. The only reason the city knew is because her subordinates complained. That's why we knew. We wouldn't have had a clue otherwise. And I think that's the most important distinction when it comes to what the court had to do when it looked at both was this reasonable opposition? Was the termination a pretext? How do we balance under the First Amendment? How does Officer Ronca show up again? Does she have to friend him? Is this all on Facebook? Yes. So what happens is in 2013, August, she admits that she refriended him and the communication started by her choice. She refriends him. And as soon as she tells him to stop, he stops. He has no idea. They're unwelcome. You read the text, you will not see anything from her that says, please, I wish you wouldn't be communicating with me anymore. This is a coworker. This isn't her supervisor. This is someone who's also a supervisor of his patrol. They are on equal foot. So it could have been remedied, and it was remedied back in September of 2013. So why in October is she still complaining to her subordinates about this? What counsel said is she had no other choice. What is talking to your subordinates about this going to do? How is that presenting your complaint? She had choices. If she thought something was going on, we have an HR department. We have a police chief. We have a city manager. We have a city attorney. She had counsel. But by fall, she already had legal counsel, right? That's in the record. So she had legal counsel. By February, when she has now talked to two more subordinates, and two more subordinates have gone to a supervisor and said, I don't want to be part of this. She has a ton of options if she wants them. But that's not what she's doing. What she's doing is ruining the lives of the people underneath her. And they don't have a choice. And that's particularly true when we're talking about this group. We're talking about dispatchers who can't walk away, right? Their job is in a room, on the phones, right? They can't walk away. We're talking about a relationship that this court has recognized multiple times as being particularly important. I'm not sure of any other area where the courts have said, the relationship between communications and patrol is really important. We have got to have harmony between those two departments. That's exactly what we have here. We have a group that is particularly important to this court and that has been recognized by this court as being different. And so what the plaintiff and what the appellant has failed to do is actually brought in any evidence, any evidence that says, here's why what I did was reasonable. It was reasonable for me to be talking to my subordinate in February 2014 about things that were over because what? There is no reason for her to be talking to them, right? That's when we do a balance both for whether it's reasonable opposition and similarly when we talk about the First Amendment, the movement has to come in and say, yeah, here's why I had to do it this way. This is why what I was doing was reasonable. There's no doubt that the topics are important, but what was it about what she did that was reasonable? On the other hand, we've got exceptionally strong evidence. This isn't one of these hypotheticals. We were worried that there was disloyalty or we were worried about disharmony. We were concerned that there has the potential for people to have problems. We only know about this problem because her subordinates, individually, separately, multiple, have come to us and said, I don't want to be here. I don't want to work like this. She's telling me she can get people fired. She's telling me she's going to sue people. I can't answer her. I don't want to be in this environment. So there's no recognition from appellant on what was the city supposed to do when number five came to our offices. After we've already done progressive discipline, after we've already given her a change of environment, after we've already explained to her very clearly, here's what your choices are. Talk to the people at your level. Talk upstream from you. Do not do that to your subordinates. That's what this case is about, is what she's done to them. And so the trial court was correct when it looked at the facts and said, where is the evidence that Ms. Sandoval has brought that said, this is something that a reasonable person would do. There is a balance of interest for her to take this action. And we would say, Your Honor, that there is none. The court has no questions. Thank you. May it please the court, I would just like to address a few issues brought up by opposing counsel. Contrary to what opposing counsel has done, they have presented a very strong and persuasive case about how a jury could answer no to the question of retaliation. But that's only one side of the story. Her argument and the district court's opinion in their briefing ignores the evidence that Ms. Sandoval was being watched by her supervisor. And we have testimony about that in the summary judgment record. If you look at the text messages, you will see that they said that she was being watched. You need to be careful. Watch your six. It's an old boys' network here. A jury could infer from that that there was heightened scrutiny of Ms. Sandoval. Combine that with the fact that Laurie Bauman admits other employees discussed personal issues. Combine that with the fact that nobody else was written up, nobody else was disciplined or reprimanded, with the fact that she was told not to discuss personal issues. And the personal issue that a pally just said she was fired for was a complaint of sexual harassment. And I heard nothing in their argument that said that they dispute that she believed that she had been sexually harassed. And if you look through the affidavits of Ms. Polasek, of Ms. Cawthorn, of Ms. Bauman, you see that they all say that she complained of sexual harassment because she believed she had been sexually harassed. If the district court's opinion stands, this will put the 5th Circuit in conflict with at least four other circuits, the 2nd Circuit, the 4th Circuit, the 6th Circuit, and the 8th Circuit. These various cases are discussed in my brief, but the most important one is probably the 6th Circuit 2015 decision in Yazdian v. ConMed Endoscopic Technologies. In that case, an employee was fired for insubordination. And in the email detailing the insubordination the employee was fired for, it referenced a phone conversation during which that employee made complaints of a hostile environment and discrimination. The 6th Circuit then held that at the summary judgment stage, we cannot accept an employer's conclusory claim that an employee was insubordinate when the alleged insubordination consists of refusing to cease what a jury could find to be a reasonable Title VII protected activity. The court went on to say that insubordination may be the protected activity may be considered insubordination in response to a valid complaint of discrimination. The 4th Circuit agrees. Resolution of a factual issue such as the true motivation behind the reprimand letter which referenced protected activity was a jury function. This is what this court found in ION. This is what this court upheld the magistrate's factual findings in the Fisher v. Lufkin case. I think the key issue is... Mr. Fisher, what evidence do you have that any of these coworkers went to complain about your client because she had made reports of harassment? The evidence would be reasonable inferences from the fact that when Ms. Sandoval spoke with other dispatchers, they said you were being watched. Be careful with what you do. And there is also evidence in these same messages that Belinda Polasek actually called up Ms. Sandoval and apologized for complaining about her. A jury could infer that that means that these people were sought out, were asked for their opinions. And if you read the first internal affairs investigation, that is what it says, is that Ms. Velasquez sought out Ms. Polasek and asked her to basically complain. A jury could find that. Thank you very much. Thank you, Your Honor.